# Exhibit E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SCANVINSKI JEROME HYMES,

       Plaintiff,

vs.                  CASE NO. CV164288

MILTON BLISS, et al.,

       Defendants.
_____/


DEPOSITION OF
SCANVINSKI JEROME HYMES
May 14, 2018


Reported by:   HANNAH KAUFMAN & ASSOCIATES, INC.
JESSICA AYRES   Certified Shorthand Reporters
CSR# 14180     150 Executive Park Blvd., Suite 4600
San Francisco, California 94134-3333
(415) 337-2077

Hannah Kaufman & Associates, Inc.

1                        I N D E X

2

3   DEPOSITION OF SCANVINSKI JEROME HYMES

4

5   EXAMINATION BY:                           PAGE

6   MS. ROSENBLIT                          5, 178

7   MR. KATON                               177

8

9

10

11                    E X H I B I T S

12               DESCRIPTION              PAGE

13   Exhibit 1    Complaint by a Prisoner      125

14   Exhibit 2    Amended Complaint            131

15   Exhibit 3    Video of S. Hymes' interview    133

16                with Lt. Flewellen

17   Exhibit 4    Letter signed by Lt. Flewellen   138

18   Exhibit 5    Claim against City and County    139

19                of San Francisco

20   Exhibit 6    Photos Bates-stamped 132-141      140

21   Exhibit 7    Cell extraction video        148

22   Exhibit 8    San Quentin video            169

23

24

25

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1        BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition, and on Monday, the 14th day of

3   May, 2018, commencing at the hour of 10:09 a.m. thereof,

4   at the offices of SAN FRANCISCO COUNTY JAIL, 850 Bryant

5   Street, 7th Floor, San Francisco, California, before me

6   JESSICA AYRES, a Certified Shorthand Reporter in the

7   State of California, personally appeared,

8            SCANVINSKI JEROME HYMES,

9   called as a witness herein; and the said witness, being

10  by me first duly sworn, was thereupon examined and

11  testified as is hereinafter set forth.

12                - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

3

Hannah Kaufman & Associates, Inc.

```
 1                    A P P E A R A N C E S :

 2

 3    FOR THE PLAINTIFF:

 4          Law Offices of KATON.LAW

 5          385 GRAND AVENUE, SUITE 200

 6          OAKLAND, CALIFORNIA 94610

 7          By GLENN KATON, Attorney at Law

 8          510-463-3550

 9          gkaton@katon.law

10

11    FOR THE DEFENDANTS:

12          Law Offices of SAN FRANCISCO CITY ATTORNEY'S

13          OFFICE

14          1390 MARKET STREET, 6TH FLOOR

15          SAN FRANCISCO, CALIFORNIA 94102-5408

16          By RENEE E. ROSENBLIT & BRIGGS MATHESON,

17          Deputy City Attorneys

18          415-554-3800

19          renee.rosenblit@sfcityatty.org

20          briggs.matheson@sfcityatty.org

21

22    ALSO PRESENT:

23          DEPUTY J. FRIETZSCHE

24          DEPUTY S. LOPEZ

25          DEPUTY K. MARES
```

4

1      A    No, not that I could feel or recall, no.

2      Q    No punches to the rest of your body?

3      A    Not that I could feel or recall, no.

4      Q    Any other force against you at that time?

5      A    No -- well, I was dragged out of the cell.

6      Q    Before we get to leaving the cell, when you're

7   on the floor there, anything other than what we've

8   talked about, the kick to the nose and the punches to

9   the head?

10      A    No.

11      Q    Before the SORT team entered the cell, did you

12   receive any orders from the deputies?

13      A    Not -- no, none at all.

14      Q    You were ordered to cuff up?

15      A    Yes.

16      Q    And you said you complied?

17      A    Yes.

18      Q    Any other orders?

19      A    No.

20      Q    When they took you to the ground, were you

21   resisting?

22      A    No.

23      Q    Did you move your arms or torso?

24      A    No, no movements.  I didn't -- I was just

25   complying with the prior orders that I had been given,

34

Hannah Kaufman & Associates, Inc.

1    so I offered to resistance.

2        Q    When the SORT team first showed up and Sergeant

3    Bliss was there, were you still yelling or talking

4    loudly?

5        A    Yes, I do recall saying to Sergeant Bliss, "You

6    pepper sprayed me for talking shit to you."

7        Q    Did you say anything else?

8        A    I can't remember what I said.  I said

9    something, but I can't remember what I said.

10       Q    Were you cursing?

11       A    Yes, I think I was.

12       Q    What about as you were cuffing up, were you

13   still yelling or talking loudly?

14       A    I may have been.  I'm not sure, but I think I

15   may have been.

16       Q    Were you still cursing?

17       A    I think.

18       Q    What about when the deputies entered your cell

19   and started taking you to the ground, were you still

20   yelling or talking loudly?

21       A    No, not that I remember, no.

22       Q    Or cursing?

23       A    No.

24       Q    Were you telling the deputies, "Come on in and

25   get me," "Come on in and get me"?

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1        A    I don't recall that, no.

2        Q    Do you remember telling that to Sergeant Bliss

3    that morning with the pepper spray, "Come on in and get

4    me"?

5        A    No, I don't recall that either.

6        Q    So for timing, in the morning before the SORT

7    team, when Sergeant Bliss was there --

8            You with me?

9        A    Yes.

10       Q    -- did you say to him, "Come on in and get me.

11   I'm going to kill you, Bliss, and I'm going to run on

12   over your kids"?

13       A    No, I don't recall saying nothing like that.

14       Q    Did you tell him, "I'm going to kill all of

15   your deputies if they come in"?

16       A    No, I don't recall that either.

17       Q    Did you say those things at any point that day

18   to him?

19       A    No, I don't recall that.  I don't think I said

20   any of that.

21       Q    Did the deputies give you orders to stop

22   resisting?

23           MR. KATON:  Objection.  Vague.

24           MS. ROSENBLIT:  I'm sorry, you're right.

25   BY MS. ROSENBLIT:

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

```
1      jail and Sacramento jail?

2         A    No.

3         Q    Have you ever been to federal prison?

4         A    No.

5         Q    Are you going to be going to federal jail?

6         A    I hope not.

7              MR. KATON:  Objection.  Calls for speculation.

8      BY MS. ROSENBLIT:

9         Q    If you know.

10        A    I hope not, no.

11        Q    Have you been in fights with corrections

12     officers in the past?

13             MR. KATON:  Objection.  Vague.

14     BY MS. ROSENBLIT:

15        Q    Prior to July of 2014, have you been in a fight

16     with a corrections officer?

17        A    I've defended myself against corrections

18     officers.

19        Q    What if I call it "physical altercation."  So

20     before July 2014, had you been in physical altercations

21     with corrections officers?

22        A    Well, altercations is kind of vague.

23     Altercation could -- I don't know what your meaning of

24     physical altercation is.

25        Q    Like a physical fight.  Have you been in a
```

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1    situation where you were punching or kicking or

2    otherwise physically fighting corrections officers?

3         A   I've resisted corrections officers.

4         Q   How many times have you defended yourself

5    against corrections officers?

6         A   Numerous.  I can't recall.  I mean --

7         Q   More than ten?

8         A   Yes.

9         Q   More than 20?

10        A   Yes.

11        Q   More than 30?

12        A   Yes.

13        Q   More than 50?

14        A   Yes.

15        Q   More than 75?

16        A   Maybe.

17        Q   More than 60?

18        A   Yes, maybe.

19        Q   So somewhere around 60, between 60 and 75?

20        A   That's an estimate.  It could be more, I'm not

21   sure.  It could be less.

22        Q   When I say "corrections officer," I'm talking

23   about a prison guard.

24            We're on the same page?

25        A   Yes.

104

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1      Q    What about physical fights or altercations with
2   deputies in jails, have you been in those as well?
3      A    None that I can recall.
4      Q    So you don't recall any fights with jail
5   deputies, but with prison guards, maybe 50 to 75 times?
6      A    Yes.
7      Q    In those 50 to 75 times, did you instigate any
8   of those fights?
9      A    No, I don't think so.
10      Q    Have you ever been the first one to throw a
11   punch?
12      A    No, I don't think so.
13      Q    So it's your testimony that you're always
14   defending yourself?
15      A    Yes, pretty much.
16      Q    Have you ever used your leg irons as a weapon
17   against a prison guard?
18      A    I can't recall.
19      Q    Have you ever used your leg iron to wrap it
20   around the leg of a prison guard?
21      A    I can't recall that.
22      Q    You don't remember if you've done that or not?
23      A    No, I don't.
24      Q    To your knowledge, have you ever injured a
25   prison guard?

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1      A    No, not to my knowledge.

2      Q    To your knowledge, you've never broken the knee

3  of a prison guard?

4      A    No, not to my knowledge.

5      Q    Broken the leg of a prison guard?

6      A    Not to my knowledge.

7      Q    Have you ever threatened to kill prison guards?

8           MR. KATON:  Objection.  Vague.

9           THE WITNESS:  I can't say I haven't.  I

10  can't -- I don't recall, though.

11  BY MS. ROSENBLIT:

12      Q    You don't know one way or another?

13      A    I've made threats, but I can't say particulars.

14  I don't remember.

15      Q    You have made threats against guards?

16      A    Yes.

17      Q    What about against deputies, have you

18  threatened deputies?

19      A    At which time?  I mean, where?  When?

20      Q    Sure.  How about since July of 2014 at San

21  Francisco County Jail, have you threatened deputies?

22      A    Not to my -- no, I don't recall.

23      Q    On July 24, 2014, did you threaten any

24  deputies?

25      A    No, I don't recall making threats.  Just

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1    verbalization of cussing.

2        Q    Just cussing but not threatened to kill

3    anybody?

4        A    No.

5        Q    What about before July 2014 in prison, have you

6    threatened prison guards?

7            MR. KATON:  Objection.  Asked and answered.

8            THE WITNESS:  Yes, I've threatened prison

9    guards.

10   BY MS. ROSENBLIT:

11       Q    Do you remember any of those threats, what you

12   said?

13       A    No.

14       Q    Are you familiar with the California prison

15   point system?

16       A    Yes, at one time I was.  I haven't been to

17   prison in a while, so I don't know what it is now.

18       Q    Do you know how many points you had when you

19   were in the California prison system?

20           MR. KATON:  Objection.  Vague.

21           THE WITNESS:  At what time?  I mean, when I

22   first arrived or when I discharged?

23   BY MS. ROSENBLIT:

24       Q    That's a good question.  How about when you

25   first arrived.

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1        A    I had 17.

2        Q    17 points?

3        A    Yes.

4        Q    Do you have an understanding as to what those

5    points were based on?

6        A    Your time, whether you were married, served

7    military service, your education level -- things like

8    that.  That's what I remember.

9        Q    Do you have an understanding as to what can

10    make points go up?

11        A    Administrative write-ups, behavioral write-ups.

12        Q    What about fights?

13        A    Yes.

14        Q    That would make your points go up?

15        A    Yes.

16        Q    If you assaulted someone, would that make your

17    points go up?

18        A    Yes.

19        Q    Did you ever assault a prison guard?

20        MR. KATON:  Objection to the extent it calls

21    for a legal conclusion.

22        THE WITNESS:  Assault -- what is your

23    definition of assault?

24    BY MS. ROSENBLIT:

25        Q    Did you ever punch a prison guard?

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1      A    I don't recall.  I may have.

2      Q    Did you ever kick a prison guard?

3      A    I may have, but I can't remember particulars.

4      Q    Did you ever spit on a prison guard?

5      A    Yes.

6      Q    How many times do you think?

7      A    I don't know, maybe five.

8      Q    Could it be more?

9      A    Maybe, I'm not sure.

10     Q    How about at the time you discharged from the

11  California prison system, how many points did you have?

12     A    I was told over 2,000.

13     Q    Is that something you are proud of?

14     A    Yes.

15     Q    Why?

16     A    Because I took their disciplinary system as a

17  joke and their point system.  It didn't mean anything to

18  me.

19     Q    Do you have an understanding as to why your

20  points went from 17 to 2,000?

21     A    Yeah, a lot of incidents.

22     Q    What kind of incidents?

23     A    Well, write-ups period.  Whether disobeying the

24  order, cussing at staff.  Your points go up for

25  anything, like profanity towards staff.

109

Hannah Kaufman & Associates, Inc.

1          MR. KATON:  I'm sorry, what was that?

2          THE WITNESS:  Profanity towards staff.

3     BY MS. ROSENBLIT:

4       Q   What else?

5       A   Not following order.

6       Q   Fights?

7       A   Fights.

8       Q   Did you receive felony charges while you were

9     in California prison custody?

10      A   Yes.

11      Q   Do you know how many?

12      A   Not offhand.

13      Q   Does 30 felony charges sound right?

14      A   Sounds pretty accurate or close.

15      Q   Do you know what they were for?

16      A   Battery, resisting, weapons.

17      Q   Is this battery while you were in prison?

18      A   Yes.

19      Q   Of who?

20      A   Correction officers.

21      Q   Resisting, is that resisting officers?

22      A   Penal Code Section 69, resisting executive

23    officers.

24      Q   What about weapons, what kind of weapons?

25      A   Razors -- that's what I can remember, razors.

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1      Q   These were charges.  Did you receive

2   convictions for any of these?

3      A   For one of the weapons charges, I do recall.

4      Q   Being convicted?

5      A   Yes.

6      Q   What about battery, were you convicted of

7   battery of a corrections officer?

8      A   Yes, I was.

9      Q   Do you know what year that was -- well, let me

10  back up.

11         Has it been more than one?

12     A   Yes, it was.  I think it was two or three

13  misdemeanor batteries.

14     Q   Do you know what years those were?

15     A   The case was filed in 2000, but it was

16  concluded in 2002.

17     Q   Is that for two or three in one case?

18     A   I remember being four counts, but one count

19  being dismissed, if I remember correctly.

20     Q   Were you ever convicted of resisting, Penal

21  Code 69?

22     A   Yes.

23     Q   How many times?

24     A   I think twice in prison.

25     Q   In prison?

Deposition of Scanvinski Jerome Hymes

1      A    Yes.

2      Q    Do you know when that was?

3      A    Late '90s.  I just can't remember exactly when.

4      Q    How many convictions did you have for

5   possession of weapons in prison?

6      A    I think two or three, maybe.

7      Q    Do you recall when those were?

8      A    I just remember one being a razor.

9      Q    Do you recall when?

10     A    1995.  Maybe another, I think -- I don't -- I

11   don't want to speculate.  I don't remember.

12     Q    There could be a few more, though?

13     A    There could be, like, two more.

14     Q    We've been talking about felony charges and

15   subsequent convictions.

16          Were you also written up at various times for

17   possessing weapons?

18          MR. KATON:  Objection.  Vague.

19   BY MS. ROSENBLIT:

20     Q    In prison.

21     A    I've been written up for a lot of things.  I

22   just can't remember particulars.

23     Q    Sometimes you're written up, and you're not

24   charged; right?

25     A    Yes.

                                                        112

Hannah Kaufman & Associates, Inc.

1      Q    A write-up could include battery?

2      A    Yes.

3      Q    Or resisting an officer?

4      A    Yes.

5      Q    Or possessing a weapon?

6      A    Yes.

7      Q    And you may not be charged?

8      A    Yes.

9      Q    And then sometimes you're charged, and maybe

10   you're not convicted each time?

11     A    Yes.

12     Q    Before July 24th of 2014, had you ever been

13   extracted from a cell?

14     A    Yes.

15     Q    How many times?

16     A    I can't recall.

17     Q    More than ten?

18     A    Maybe.

19     Q    More than 15?

20     A    Maybe.  I can't recall.

21     Q    Do you know if it was more than 20?

22     A    I don't think so.

23     Q    15 to 20?

24     A    Yes, maybe.

25     Q    When we're talking about cell extractions, I'm

113

Hannah Kaufman & Associates, Inc.

1    talking about a team of guards or deputies coming to

2    extract you.

3            You understand?

4        A   Yes.

5        Q   That's your interpretation; right?

6        A   Yes.

7        Q   That's different than just having one or two

8    deputies handcuff you and take you somewhere?

9        A   Yes.

10       Q   Those 15 to 20 cell extractions, were those in

11   prisons or jails or both?

12       A   I think all prison.

13       Q   I don't know in prison if they still call it a

14   SORT team, but it's something like that?

15       A   Extraction team, cell extraction team.

16       Q   Are you familiar with reasons why guards or

17   deputies would need to extract an inmate?

18       A   No.  Because they can do what they want to at

19   any given time.  I don't know what their reason is.

20   They make a determination on why they want to extract

21   somebody.  So I don't know what their reason is.

22       Q   You're not familiar with policy?

23       A   Well, I -- one I do know is refusal to move

24   cells.

25       Q   Have you, in the past, refused to move cells?

114

Hannah Kaufman & Associates, Inc.

1      A    I'm sure I have, yeah.

2      Q    Causing an extraction team to come and get you

3    out?

4      A    Yes.

5      Q    What are some other reasons?

6      A    Doing something dangerous to yourself or

7    others.

8      Q    Have you, in the past, done something dangerous

9    to yourself or others?

10     A    Maybe, I don't know.  I didn't consider it

11   dangerous, but I guess they did.

12     Q    Sounds like you're thinking of a specific

13   occasion.

14          What is that?

15     A    Any occasion.  I'm just thinking sometimes they

16   come, and I don't think there's a need for extraction,

17   but they obviously do.  So that's what I'm thinking.

18   You know, I may be sitting in my cell and think I don't

19   need to be extracted, but they may think I need to be

20   extracted.

21     Q    You've been pepper sprayed, you said, a bunch

22   of times, 15 to 20; right?

23     A    Maybe more.

24     Q    Maybe more.  Have you ever been extracted from

25   your cell by a team after you were pepper sprayed?

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1        A    Yes.

2        Q    How many times?

3        A    A few times that I can remember -- a couple,

4    maybe.

5        Q    In those few times, is that because you refused

6    to come out and get medical treatment?

7        A    No, it's not because I refused to come and get

8    medical treatment.  It's because I refused.

9        Q    Refused what?

10       A    To come out.

11       Q    So you were pepper sprayed; right?  Yes?

12       A    Yes.

13       Q    And then you refused to come out?

14       A    Yes.

15       Q    And then an extraction team had to come and

16   pull you out; right?

17       A    Yes.

18       Q    And that's happened a few times in the past?

19       A    Yes.

20       Q    More than three?

21       A    Yeah, maybe.  Probably more than three.

22       Q    Maybe more than five?

23       A    Yeah, more than five, maybe.

24       Q    More like ten?

25       A    Five to ten, maybe, estimate.

116

Hannah Kaufman & Associates, Inc.

1     Q    That's all before July 24, 2014?

2     A    Yes.

3     Q    Have you ever kicked the side of a guard's

4  knee, causing him to fall to the ground?

5     A    Not that I remember.

6     Q    We've been talking about physical altercations

7  and fights with prison guards.

8         When you were in California prison, did you

9  also fight with inmates?

10    A    There have been incidents.  I can't think of --

11  not a lot, but some, yes.

12    Q    About how many?

13    A    How many I was written up for?

14    Q    How many happened.

15    A    Oh, I don't know.  Five, ten.

16    Q    How many do you think you were written up for?

17    A    Couple.

18    Q    Did you start these fights?

19    A    No.

20    Q    None of them?

21    A    Not that I recall.  Maybe one or two I started.

22    Q    Your recent conviction, two assaults, who was

23  the victim in those assaults?

24    A    Tricia Hurd.

25    Q    Who is she?

117

Deposition of Scanvinski Jerome Hymes

1      A    Yes.

2      Q    Who were the deputies involved?

3      A    I don't really know who all was involved.  I

4    just was -- provided him with the inmate's name that I

5    know.

6      Q    Was it against you, the use of force?

7      A    No.

8      Q    Who was it against?

9      A    From the information I had, it was Inmate

10   Harris.

11     Q    Why did you talk to a reporter about that?

12     A    The transparency with the sheriff's department.

13   You know, if there's things going on that's illegal and

14   excessive use of force, reporters need to report about

15   it.

16     Q    Were you ever interviewed for television when

17   you were in prison?

18     A    Yes.

19     Q    What program is it?

20     A    Lockup.

21     Q    How did you become the one interviewed for

22   that, do you know?

23     A    Still kind of a mystery to me to this day.  I

24   mean, I was just told that they wanted to interview me.

25   They heard about me.  They wanted to interview me.

168

Hannah Kaufman & Associates, Inc.

1        Q    Who told you that?

2        A    One of the producers.

3        Q    Did they ask if you would be willing to go on

4   the show?

5        A    Yes.

6        Q    What did you say?

7        A    "Sure, I'm an open book.  Why not."

8        Q    They interviewed you?

9        A    Yes.

10       Q    There was a video?

11       A    Yes.

12       Q    Have you seen it?

13       A    Too many times.

14            (Exhibit 8 was marked for identification.)

15            MS. ROSENBLIT:  We're going to play what's been

16   marked Exhibit 8, and, again, the court reporter doesn't

17   have to report the video audio.

18            (Exhibit 8, video recording played.)

19   BY MS. ROSENBLIT:

20       Q    It's called "Lockup:  San Quentin"?

21       A    Yes.

22       Q    Is this what you were thinking of?

23       A    Yes.

24       Q    Is that you?

25       A    Yes.

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1      Q   And the white shirt, is that you?

2      A   Yes, the white jumpsuit, yes.

3      Q   Is that your voice?

4      A   Yes.

5      Q   Identifying yourself as Scanvinski Hymes?

6      A   Yes.

7      Q   Is that you in the orange?

8      A   Yes.

9      Q   They're showing some old video for MSNBC; is

10   that right?

11     A   Yes.

12     Q   Have you been part of more than one television

13   program?

14     A   Well, it's all Lockup, yes.   It's the Lockup

15   series, yes.

16     Q   Have you been interviewed multiple times by

17   Lockup?

18     A   Yes, a couple times -- a few times.

19     Q   They've done several different airings of the

20   show?

21     A   Yes.

22     Q   Do you know when this one where you're in

23   orange, do you know what year that is?

24     A   Maybe late '90s.   It's Pelican Bay, so it's

25   late '90s.

170

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1      Q    What about in the beginning when you're in the
2   white?
3      A    That was February 2007 right before I
4   discharged.
5      Q    Is that you just jumping out of the chair?
6      A    Yes, yes.
7      Q    Is that you?
8      A    Is what me?
9      Q    I'm sorry, the part with -- it looks like
10   they've got you on the ground.  Oh, no, that's not you.
11         Now they're walking.  It looks like you're back
12   in the white jumpsuit with the dark hat?
13      A    Yes.
14      Q    That's you?
15      A    Yes.
16      Q    Is that you talking about how many points you
17   have?
18      A    Yes.
19      Q    "Over 2,000"?
20      A    Yes.
21      Q    "30 to 40 felonies"?
22      A    Yes.
23      Q    Are those convictions?
24      A    No, charges.
25      Q    "Assault staff," is that what you just said?

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1        A    I've been charged with assaulting staff, yes.

2        Q    Do you know of more airings of this other than

3    the '90s and 2007?

4        A    Not that I'm aware of.  I've been asked to

5    participate for the shows, but I refuse.

6        Q    Have you been on any other television shows?

7        A    None that I'm aware of, unless someone was

8    secretly videotaping me, you know.

9        Q    Are you aware of any other video of this

10   incident by anyone?

11          MR. KATON:  Objection.  Asked and answered.

12          THE WITNESS:  No.

13   BY MS. ROSENBLIT:

14       Q    You don't have a cell phone in jail?

15       A    No.

16       Q    Do you know if John Davis has a cell phone in

17   jail?

18       A    I wouldn't know that.

19       Q    The Lockup video talks about your favorite form

20   of mayhem is inciting cell extractions.

21          Do you agree?

22       A    No.  That's their opinion.

23       Q    This is not your first lawsuit; right?

24       A    No.

25       Q    How many federal lawsuits have you filed?

172

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1      A   A few.  I can't remember how many.

2      Q   I counted 11 other than this one.

3          Does that sound right?

4      A   It may be.

5      Q   It looks like you filed one in May of 2003, a

6   civil rights complaint against the state warden and the

7   corrections officers?

8      A   I don't remember.  I can't remember what it was

9   or what it was about.

10     Q   Were you represented by Pacific Law, a Randolph

11  Daar?

12     A   Oh, yes, yes.

13     Q   You had a bench trial in front of Judge

14  Illston?

15     A   Yes.

16     Q   You also filed a civil rights lawsuit against

17  the warden and corrections officers in April of 2001?

18     A   I mean, I guess.  I don't recall it.

19     Q   You filed a lawsuit, a civil rights lawsuit

20  against the warden and corrections officers in October

21  of 2000?

22     A   I don't remember it.

23     Q   You don't remember, but you know you filed

24  other lawsuits?

25     A   Yes, I know.  I just can't remember particular

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1    incidents or what each lawsuit is about.

2        Q   Well, my records show that there was the one in

3    2003 against the warden and corrections officer, one in

4    2001 against the warden and corrections officer, two in

5    2000 against the warden and corrections officers.

6            Does that sound like it could be right?

7        A   It could be, I don't remember.

8        Q   Two in 1997 against the warden and corrections

9    officers?

10       A   I remember, maybe, one in '97.

11       Q   Three in 1996, three civil rights complaints

12   against the warden and corrections officers?

13       A   It sounds familiar.  I know at least one for

14   sure in 1996.

15       Q   One of them you were represented by Munger

16   Tolles; right?

17       A   Yes.

18       Q   One in 1994, a civil rights complaint against

19   the warden and corrections officers?

20       A   Sounds familiar.

21       Q   One in 1993 against the warden and corrections

22   officers?

23       A   Yeah, that sounds familiar.

24       Q   I counted 11 others, other than this one.

25           Does that sound right?

174

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1     A   Yes.

2     Q   Most of these were dismissed; right?

3     A   Yes, I believe so.

4     Q   Then the trial in front of Judge Illston, you

5   lost; right?

6     A   Yes.  And I settled a couple out of court.

7     Q   What is your highest degree of education?

8     A   I have my GED.

9     Q   We talked about your prison history, in and

10   out.  When you've been out of jail, have you had a job?

11     A   Not really.

12     Q   What did you do for money?

13     A   Oh, I did work in 2003, 2004.  I worked for Van

14   Jones at the Ella Baker Center for human rights.

15     Q   What did you do there?

16     A   I was the Bay Area Police Watch Outline

17   Coordinator.

18     Q   Did you work there for a year?

19     A   No, maybe about six months, maybe.  I don't

20   remember.  Something like that.

21     Q   Is that a paid position?

22     A   Yes.

23     Q   How much were you paid?

24     A   Approximately $13 an hour.

25     Q   Any other jobs while you were out?

175

Deposition of Scanvinski Jerome Hymes

Hannah Kaufman & Associates, Inc.

1      I do hereby certify that the witness in the

2    foregoing deposition was by me duly sworn to testify the

3    truth, the whole truth, and nothing but the truth in the

4    within-entitled cause; that said deposition was taken at

5    the time and place therein stated; that the testimony of

6    the said witness was reported by me, a Certified

7    Shorthand Reporter and a disinterested person, and was

8    under my supervision thereafter transcribed into

9    typewriting; that thereafter, the witness was given an

10   opportunity to read and correct the deposition

11   transcript, and to subscribe the same; that if unsigned

12   by the witness, the signature has been waived in

13   accordance with stipulation between counsel for the

14   respective parties.

15      And I further certify that I am not of counsel or

16   attorney for either or any of the parties to said

17   deposition, nor in any way interested in the outcome of

18   the cause named in said caption.

19      IN WITNESS WHEREOF, I have hereunto set my hand

20   the 23rd day of May, 2018.

21

22   _____

       JESSICA AYRES

23       CSR No. 14180

24

25

180

Deposition of Scanvinski Jerome Hymes