# Exhibit K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---


SCANVINSKI JEROME HYMES,

             Plaintiff,

vs.                                    Case No. 3:16-cv-04288-JSC

MILTON BLISS; VICTOR M.
SANCHEZ, JOSEPH A. LEONARDINI;
SCOTT NEU; EUGENE A. JONES;
PAUL TIMPANO; PIERRE A. GRAY,

             Defendants.
_____/




THE VIDEOTAPED DEPOSITION OF

LIEUTENANT VICTOR M. SANCHEZ


Wednesday, August 15, 2018






Reported by:  Patricia Rosinski, CSR #4555

CLARK REPORTING & VIDEO CONFERENCING
2140 Shattuck, Suite 407
Berkeley, California 94704
(510) 486.0700
www.clarkdepos.com

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4         KATON.LAW
           By:  GLENN KATON
 5              Attorney at Law
           385 Grand Avenue, Suite 200
 6         Oakland, California 94610
           (510) 463-3350
 7         gkaton@katon.law

 8   - and -

 9         LAW OFFICE OF CAITLIN KELLY HENRY
           By:  CAITLIN KELLY HENRY
10              Attorney at Law
           1201 Martin Luther King Jr. Way, Suite 200
11         Oakland, California 94612
           (510) 277-2025
12         ckh@caitlinkellyhenry.com

13

14   FOR THE DEFENDANTS:

15         CITY AND COUNTY OF SAN FRANCISCO
           OFFICE OF THE CITY ATTORNEY
16         By:  RENEE E. ROSENBLIT
                Deputy City Attorney
17              BRIGGS MATHESON
                Deputy City Attorney
18         Fox Plaza
           1390 Market Street, Sixth Floor
19         San Francisco, California 94102
           (415) 554-3853
20         renee.rosenblit@sfcityatty.org
           briggs.matheson@sfcityatty.org
21

22

23   AND THERE ALSO BEING PRESENT:

24   Steve Zavattero, Legal Videographer

25                        ---oOo---
```

2

1    un- -- unable to give truthful and accurate

2    testimony today?

3         A.    No.

4         Q.    And you've had the opportunity to meet with

10:16AM    5    your counsel to prepare for this deposition?

6         A.    Yes.

7         Q.    So we're here today about an incident -- or

8    a series of incidents involving Scanvinski Jerome

9    Hymes on July 24th, 2014.

10:16AM   10         If I refer to "the incident" or "the day of

11    the incident," will you understand that I'm

12    referring to July 24th, 2014?

13         A.    Yes.

14         Q.    Were you working on the day of the

10:17AM   15    incident?

16         A.    Yes.

17         Q.    What time did you start working?

18         A.    0600 hours.

19         Q.    And had you ever seen Mr. Hymes before the

10:17AM   20    day of the incident?

21         A.    Yes.

22         Q.    When did you see him before the day of the

23    incident -- or when was the most recent time to the

24    incident?

10:17AM   25         A.    I want to say July 22nd.

12

1       Q.   And what were the circumstances where you

2   saw Mr. Hymes on July 22nd -- is that -- you're

3   pretty sure, but not certain, it was July 22nd?

4       A.   If the incident occurred on the 24th --

10:17AM   5   23rd, 22nd -- it's July 22nd.

6       Q.   Okay.

7       A.   I'm sure about that.

8       Q.   Okay.   What were the circumstances where

9   you saw Mr. Hymes on the 22nd?

10:18AM   10       A.   That's the day he arrived to County Jail

11   Number 4.

12       Q.   And were you involved with processing him

13   in?

14       A.   Yes, I was.

10:18AM   15       Q.   And could you describe that process for us?

16       A.   Sure.

17            I was advised by Captain Adams.   She had

18   received a phone call that he was on his way to our

19   facility.   She asked me to have dep- -- deputized

10:18AM   20   staff assist me.   And when he arrived on the seventh

21   floor, when the elevator doors opened, I took

22   control, along with the deputies, of Mr. Hymes, and

23   we walked into processing.

24            And while in pro- -- the processing room,

10:18AM   25   we had a conversation.

13

```
 1        Q.    Before we get to that conversation, is it
 2   normal for a captain to call ahead when a prisoner
 3   is going to be arriving at the jail?
 4        A.    For this particular inmate, yes.
 5        Q.    So for inmates in general, no?
 6        A.    Correct.
 7        Q.    What was special about Mr. Hymes that
 8   Captain Adams called ahead?
 9             MS. ROSENBLIT:  It may call for
10   speculation.
11             MR. KATON:  I'll -- I'll withdraw that.
12        Q.    What -- what did Captain Adams tell you
13   about Mr. Hymes that made him special?
14        A.    I was advised -- and I'm just going to try
15   and recall -- the day prior -- or two days prior to
16   him arriving to our facility that this inmate was
17   coming from state prison, and there was a lot of
18   documented violence regarding Mr. Hymes.  And so,
19   because of that, since I'm the administrative
20   sergeant assigned to my facility, it is my duty to
21   do, basically, my homework to be able to brief the
22   teams about the type of inmate we are receiving.
23        Q.    So it's your understanding that Mr. Hymes
24   was -- I don't know if "transferred" is the right
25   word, but moved from a CDCR facility to the
```

14

1    San Francisco jail?

2        A.    That is correct.

3        Q.    And then what did Captain Adams tell you

4    about Mr. Hymes?  To the best you can recall, of

10:20AM  5    course.

6        A.    To do my research.  To -- there were videos

7    regarding Mr. Hymes' history.

8        Q.    What's -- what's the -- I'll withdraw that.

9              Did Captain Adams give you any information

10:21AM 10    about Mr. Hymes or just a recommendation to do your

11    work?

12        A.    Yes.  I believe she said that we have to be

13    very cautious with this particular inmate because of

14    his past history.

10:21AM 15        Q.    And did she say what -- what it was about

16    his past history that would require you to use

17    caution with him?

18        A.    I don't recall what she may have said.

19        Q.    So when she suggested that you do your

10:22AM 20    research and that there were videos of his history,

21    did you do any research?

22        A.    Yes, I did.

23        Q.    What did you find in your research, if

24    anything?

10:22AM 25        A.    The YouTube videos, the interviews that

                                                              15

1    were conducted at CDC; the violence, him acting out;

2    him injuring, I believe, three CDC officers who

3    medically retired out with bad knee injuries; his

4    points at the CDC level in the state prison.

10:23AM    5         Q.    Anything else that you recall from your

6    research?

7         A.    Yes.  Just by watching the videos, that he

8    is able to switch from normal behavior to violent

9    behavior in a moment's notice.

10:23AM   10         Q.    Is that something that you heard someone

11    say on the video or something that you witnessed on

12    a video?

13         A.    That I witnessed.

14         Q.    And what -- do you remember what the -- who

10:23AM   15    recorded the video, or what -- what video it was

16    that you witnessed?

17         A.    No.  No, I don't.

18         Q.    To the best of your recollection, it was on

19    YouTube, though?

10:23AM   20         A.    I want to say it was on YouTube.  It could

21    have been something that somebody was interviewing

22    him.  It could have been -- you know, it's, like, as

23    an example, Channel 2 News or somebody, and there

24    may have been a -- a web, you know, or link to go to

10:24AM   25    and -- and that produced the video footage.  It

16

1    could have actually even been -- been the people at

2    CDC that put it together.   I'm not a hundred percent

3    sure.

4         Q.   Yeah, so maybe I wasn't clear, and I don't

10:24AM  5    want you to guess, but let me ask it this way:

6    Do -- do you recall what site --

7         A.   No.

8         Q.   So it could have been a news site?

9         A.   It could have been.

10:24AM  10        Q.   So what happened -- well, let me withdraw

11   that.

12             Is there anything else that you recall

13   about your discussion with Captain Adams?

14        A.   No.

10:24AM  15        Q.   So I believe you said, after you spoke with

16   Captain Adams, Mr. Hymes arrived and you had a

17   conversation?

18        A.   Yes, I did.

19        Q.   Do you recall what you discussed with

10:25AM  20   Mr. Hymes?

21        A.   Yes.

22             When we were in the processing room,

23   generally that's where we give the inmates a bed

24   roll, toiletry items.   And if there's any questions

10:25AM  25   that the inmate may have, we generally will answer

17

1   those there.

2          But I, as the administrative sergeant,

3   wanted to give him instructions on where he was

4   going to be housed, the process to ask questions

10:25AM  5   towards deputies or supervisors; that there was walk

6   times.

7          And in the middle of my conversation, he

8   stopped me, and he basically said, which I've never

9   heard an inmate, in all my years, tell me, "Stop

10:26AM  10  that shit," or something like that.  "We're going to

11  rock-n-roll every day."  And, "Get your team

12  together."  And, "You guys may hurt me, and I'll end

13  up in the rubber room" or "safety cell" -- I can't

14  recall what he said -- and, "It will take me a

10:26AM  15  couple of weeks to heal, and once I'm healed, it's

16  going to be back on, and this is going to happen

17  every day, so get your team ready."

18       Q.   And did the conversation continue after

19  that?

10:26AM  20       A.   No, it did not.

21       Q.   So what happened next?

22       A.   I said, "Thank you," and I walked him

23  towards the gate.  The gate opened.  I -- we, as a

24  team, escorted him back to his cell, put him in his

10:26AM  25  cell, uncuffed him, and walked out.

                                                    18

1          Q.    And did you see him again on July 22nd --

2          A.    No.

3          Q.    -- 2014?

4                And did -- other than what he said, which I

10:27AM  5   understand you're saying is extremely unusual, did

6    he resist you or the other deputies who were with

7    you in the process of escorting him to his cell?

8                MS. ROSENBLIT:   Objection.   Vague and

9    compound.

10:27AM  10               THE WITNESS:   No.

11               MR. KATON:   Q.   So when was the next

12   time -- well, let me withdraw that.

13               Was the call you received from

14   Captain Adams the first you had heard of Mr. Hymes?

10:28AM  15               MS. ROSENBLIT:   Objection.   Vague as to

16   time.

17               THE WITNESS:   I would say probably.   I'm --

18   I believe, like, the best of my recollection.

19               MR. KATON:   Q.   When did you next see

10:28AM  20   Mr. Hymes after you left him in his cell on

21   July 22nd, 2014?

22          A.    July 23rd.

23          Q.    What were the circumstances in which you

24   saw him on July 23rd?

10:28AM  25          A.    I was advised by, I believe at the time,

19

1      Lieutenant Cabebe.

2          Q.    Can you spell that?

3          A.    C-A-B-E-B-E.

4          Q.    I'm sorry.  Go ahead.

10:29AM    5          A.    He advised us that Mr. Hymes was violently

6      acting out, and I -- I want to say that Cabebe's

7      words were, "His violent behavior falls under the

8      category of a safety cell placement."

9          Q.    Aside from the general description of

10:29AM   10     violent behavior, did Lieutenant Cabebe tell you

11     anything specifically about what Mr. Hymes was doing

12     that he was characterizing as violent?

13         A.    I don't recall.

14         Q.    And had you heard anything about Mr. Hymes'

10:30AM   15     behavior in the jail from the time you left him in

16     his cell on July 22nd, 2014, until you heard what

17     you just described from Lieutenant Cabebe?

18         A.    Correct me if I'm wrong, you're asking me

19     had -- had he acted out from the day I left him till

10:30AM   20     the day Cabebe said he was acting out?

21         Q.    Had you heard anything about that, correct.

22         A.    No.

23         Q.    So what happened after -- so

24     Lieutenant Cabebe told you that Mr. Hymes was

10:30AM   25     violently acting out.

20

1          What happened next?

2          A.    We -- Captain Adams, Lieutenant Cabebe,

3    Sergeant Kester, and I met inside the emergency

4    operations center.   And I don't recall -- and I have

10:31AM  5    to look -- possibly look at my notes, but we had a

6    conversation, and I was briefing the captain and the

7    lieutenant and the other sergeant that this was just

8    his way of testing our -- the team, and I felt that

9    we should not engage, so basically I was

10:31AM  10   deescalating the situation, and basically informed

11   the other supervisors that it was just his way of

12   acting out.

13         Q.    So at this point, though, did you know what

14   the -- what was described as violent behavior, what

10:32AM  15   that was?

16         A.    No.

17         Q.    Well, wouldn't your decision on what action

18   to take depend on whether his violent behavior was

19   throwing paper at a deputy versus sharpening a knife

10:32AM  20   or grabbing a deputy and punching him or her?

21         A.    It wasn't my decision.

22         Q.    What wasn't your decision?

23         A.    To determine his next course of action or

24   the team's course of action.   It was the decision on

10:32AM  25   the lieutenant as to what he deemed as violent

21

1    behavior and what was -- what was going to be the

2    next step.

3         Q.   I see.

4              So -- so when you said that you suggested

10:32AM  5    that this was Mr. Hymes' way of testing the team and

6    that you shouldn't take action in order to try and

7    deescalate, that was your suggestion, not the

8    decision, for course of action?

9         A.   That is correct.

10:33AM  10             MS. ROSENBLIT:   Objection to the extent it

11   may mischaracterize testimony.

12             MR. KATON:   Q.   I'm just asking if what I

13   just said was accurate.   If it wasn't, please tell

14   me.

10:33AM  15        A.   That is correct.   It was just a suggestion.

16        Q.   So what happened after you made that

17   suggestion to Captain Adams, Lieutenant Cabebe --

18   and was it Sergeant Kester?

19        A.   Correct.

10:33AM  20        Q.   What happened next?

21        A.   Looking at my notes, I believe that I

22   walked back to E Tank, and I had a moment of

23   conversation with Mr. Hymes.

24        Q.   So when you say, based upon your notes, is

10:34AM  25   that because you reviewed a document to prepare for

22

1    this deposition, but you don't have an independent

2    recollection of it?

3        A.   That's correct.

4        Q.   And when you made the suggestion you

10:34AM  5   described about Mr. Hymes is just testing the team,

6    was there, in fact, a decision communicated to you

7    about how to deal with Mr. Hymes going forward?

8            MS. ROSENBLIT:   Objection.   Vague.

9            THE WITNESS:   Lieutenant Cabebe just made a

10:34AM  10  statement that his actions deemed necessary for a

11   safety cell placement.   That's all that was given to

12   me.

13           MR. KATON:   Oh, okay.

14       Q.   So as a result of that meeting in the EOC

10:34AM  15  room, it was determined that Mr. Hymes would be

16   placed in a safety cell?

17       A.   That's what I was advised -- or that --

18   what was given to the other supervisors, the

19   information.

10:35AM  20      Q.   And, at this time, Mr. Hymes was in E Tank?

21       A.   I don't recall if it was E Tank.   I -- I --

22   it may have been F Tank.   I'm not sure.

23       Q.   So what happened after the meeting with the

24   other staff in the EOC?

10:35AM  25      A.   I'd have to take a look at my -- the notes

23

1    or my written statement.  But the -- I guess the

2    decision that I would go back and talk to Mr. Hymes

3    to see if I can find out what's the reason based

4    upon his actions.  I'm not a hundred percent sure.

10:36AM   5          I -- according to my notes, I walked

6    into -- I believe it was F Tank, and I don't recall

7    the statement.  And according to my notes, he said

8    that he wanted to stab somebody or -- or end up on

9    death row, and I, according to my notes, asked him,

10:36AM   10   "And how are you going to do that?"  And he said,

11   "By stabbing one of you guys."

12          MR. KATON:  I'll ask the court reporter to

13   mark this Sanchez 1, please.

14          (Whereupon, Plaintiff's Exhibit 1 was

10:36AM   15          marked for identification and is attached

16          hereto.)

17          MR. KATON:  Q.  When you are referring to

18   your notes, are you referring to Exhibit 1?

19   A.   Yes.

10:37AM   20   Q.   Did you make any notes about Mr. Hymes

21   other than Exhibit 1?

22   A.   No.  No.

23   Q.   So you went to F Tank.  You went to talk to

24   Mr. Hymes.  He said things about wanting to get on

10:37AM   25   death row and stabbing someone.

24

1          What happened next?

2     A.     I don't recall, but I -- I believe, after

3   he made this statement, I walked out.    There was no

4   need to continue the conversation.

5          I walked back to the emergency operations

6   center, advised the team of supervisors of my

7   conversation.

8     Q.     And what happened after you advised the

9   team in the EOC of your conversation with Mr. Hymes?

10     A.     I don't recall.    There was probably

11   people's opinion on the next course of action that

12   was being presented.

13     Q.     And do you remember a decision being made

14   on the next course of action to be taken?

15     A.     Yes.

16     Q.     What was that?

17     A.     The captain advised the lieutenant and the

18   sergeant -- Sergeant Kester and I to come to a

19   mutual agreement, and I stood firm on basically

20   standing down and expressed the reason why I felt

21   strongly about it.    And the lieutenant and the other

22   sergeant rendered a decision, which was to follow my

23   instructions -- or my suggestion.

24     Q.    When you say that your suggestion was to

25   stand down, can you -- well, let me withdraw that.

25

         1    prepared and available in case there was a need for

         2    those.  So I was just advising Sergeant Bliss that

         3    those were approved to use.

         4         Q.   Now, was anyone else in the EOC room with

10:59AM  5    you at this time?

         6         A.   I don't recall.  There was a team already

         7    preparing to put on all the Hatch gear.

         8         Q.   So you recall that there were other

         9    people --

11:00AM 10         A.   Yes.

        11         Q.   -- in the room who were preparing; you just

        12    don't recall who they were?

        13         A.   That's correct.

        14         Q.   So what happened after you relayed the

11:00AM 15    information that you just described to

        16    Sergeant Bliss while the team was preparing?

        17         A.   We go through a process of getting as much

        18    intel we -- as -- that we have at our disposal.  So

        19    classification officer may be available to brief us

11:00AM 20    on any past history, any violent behavior.  We -- we

        21    also discuss, amongst the staff that's there in the

        22    emergency operation center, any information that

        23    they have, anything that they've seen or heard.

        24             So, basically, it's just an intel gathering

11:00AM 25    type of moment, and then -- and then I -- obviously

1    I added what I knew.

2        Q.    So did the team hear from a classification

3    officer while you -- you were assembled in the EOC

4    room?

11:01AM    5        A.    I -- I believe so.

6        Q.    Do you know who the classification officer

7    was?

8        A.    By going over the notes, I believe it was

9    Deputy Lee, Rebecca Lee, from classification, if I'm

11:01AM    10    correct.

11        Q.    And do you know who spoke to Deputy Lee

12    about the information that she communicated?

13        A.    I don't recall.  I'm -- I'm going to guess

14    Sergeant Bliss may have spoken to her.

11:01AM    15        Q.    It wasn't you, though?

16        A.    I don't recall.

17        Q.    Apart from the intel that you provided and

18    from what the classification officer told

19    Sergeant Bliss, do you remember any other

11:02AM    20    information that was provided during this, I think

21    you called it, information-gathering session?

22        A.    Yes.

23            I advised the team to be very cautious;

24    that even though he is handcuffed and leg-shackled,

11:02AM    25    that he is still violent and that he has inflicted

39

1    injuries on other officers even though he was cuffed

2    and shackled.

3            I recall, in the video, three CDC officers,

4    their knees were blown out by Scanvinski Hymes

11:02AM    5    kicking backwards in a fashion that created those

6    injuries.

7            So I wanted to advise them that even though

8    he was handcuffed and shackled, to be still cautious

9    because of his violent behavior.

11:03AM    10   Q.   Do you recall anyone else providing

11   information besides you and whatever the

12   classification officer told Sergeant Bliss?

13   A.   I don't recall.

14   Q.   And do you recall Sergeant Bliss

11:03AM    15   communicating to the team anything that Deputy Lee

16   told him?

17   A.   I don't recall.

18   Q.   So at this point in the EOC room, you

19   remember yourself and Sergeant Bliss; correct?

11:03AM    20   A.   Yes, to the best of my knowledge.

21   Q.   Do you recall who any of the other deputies

22   were who were in the EOC room?

23   A.   No.

24   Q.   So what happened after the intel-gathering

11:03AM    25   session in the EOC room?

40

```
 1                REPORTER'S CERTIFICATE

 2   STATE OF CALIFORNIA     )
                             )  ss.
 3   COUNTY OF MARIN         )

 4         I, PATRICIA ROSINSKI, hereby certify:  That

 5   I am a Certified Shorthand Reporter in the State of

 6   California. That prior to being examined,

 7   LIEUTENANT VICTOR M. SANCHEZ, the witness named in

 8   the foregoing deposition, was by me duly sworn to

 9   testify the truth, the whole truth, and nothing but

10   the truth;

11         That said deposition was taken pursuant to

12   Notice of Deposition and agreement between the

13   parties at the time and place therein set forth and

14   was taken down by me in stenotype and thereafter

15   transcribed by me by computer and that the

16   deposition is a true record of the testimony given

17   by the witness.  I further certify that I am neither

18   counsel for either, nor related in any way to any

19   party to said action, nor otherwise interested in

20   the result or outcome thereof.

21         Pursuant to Federal Rules of Civil Procedure,

22    Rule 30(e), review of the transcript was not requested

23    before the completion of the deposition.

24                 _____
                   PATRICIA ROSINSKI, CSR No. 4555
25                    19th day of August, 2018
```
                                                         104